SHIPMAN, Circuit Judge
(after stating the facts as above). The single claim of the patent in suit is as follows:
“The method hereinbefore described of arresting and removing the impurities from water during an uninterrupted passage of same from a supply pipe-into a filtering apparatus, thence through a filter-bed contained therein, and out through a delivery-pipe leading therefrom, which method consists in introducing into the water simultaneously with its passage to or into the filter a substance which -will sufficiently coagulate or separate the impurities to facilitate their arrest and removal by the filter-bed, thus obviating the necessity of employing settling-basins.”
The history of the art of purification of water by sedimentation and filtration, and of the different and patented art of purification by an uninterrupted process of filtration alone, is given in the decisions to which reference has been made in the preliminary statement. 61 Fed. 840; 13 C. C. A. 380, 66 Fed. 152. The construction which was given by the court of appeals to the claim, and their definition of the invention of Hyatt, are as follows:
“The patent in suit describes a departure from anything which appears to have been done or known in the prior art, so far as appears by the record. It describes a method for the purification of water by the simultaneous applica *926 ■tíon of a specified coagulant and a process of filtration, the coagulant being applied to or mixed with the water to be filtered substantially at its introduction into the filtering apparatus, and while it is flowing continuously to the filter-bed. By this method the coagulants perform their principal work within ■the filter-bed itself. By this change in previous processes the patentee not only dispensed with the use of settling-tanks, thus saving the time and expense required in sedimentation processes like that of Spence, but he also dispensed with the additional chemical treatment of the water, and the use of the more ■complicated apparatus involved in processes like that of Paget. So far as .appears, no one had previously discovered that the agglomerating action of the coagulants could be obtained without waiting a considerable time for precipitation, or during the passage of the water through the filtering-bed.”
The defendant’s plant is a large one, and, speaking generally, thoroughly and solidly constructed. Its actual rate of flow is 3,600,000 gallons per day. That portion of the plan or method of operation which precedes the delivery of the water into the filter-beds is described by Prof. Main as follows:
“The water enters an intake bay, which is under the floor of the pump room. A dilute solution of alum is forced continuously through a small pipe into the ■stream of water which is flowing constantly into the open end of the intake main. The end of the alum pipe passes some five or six feet into the intake main, so as to deliver the alum solution well within it. The alum solution is prepared in special tanks, which are shown in the drawing. A small pump, which is kept running at a fixed rate, draws from the alum tanks and delivers the solution as described. The intake main is connected with two basins, which are alike in dimensions and arrangement. Gate valves are provided, so that either one may be cut off for any purpose while the other is kept in operation. When the gates are open, the water in these basins stands at the same level as that in the river. The basins are provided each with three transverse partitions, as shown more clearly in the detailed drawing. The water entering near the bottom passes first over a plank partition, which does not reach to the water level. It then passes downward and under the middle brick partition, through the archway in the bottom. After this it passes upward, and over the last plank partition, and then downward to the suction pipe connected to a large rotary pump, which is driven by an electric motor. This description applies to both basins, as they are alike, and each is provided with a rotary pump. The rotary pumps deliver the alum-charged water into the supply main, which feeds all the filters simultaneously.”
The combined capacity of these basins is 28,760 gallons, so that, as the outflow of the water is about 2,500 gallons per minute, the time're■quired for the passage of a given quantity of water through the basins is about 13 minutes, and the water, as it flows over partitions and through an archway, has little rest. The cost of these basins was $3,500. The patent declared that by the use of the described uninterrupted process the patentee dispensed “with the employment of settling basins or reservoirs as now commonly employed,” and in the concluding sentences of the decision of the court of appeals it was said that settling-tanks were used in some of the plants of the defendant between the introduction of the coagulant and the filter-bed, and in this plant the method of the complainant was not appropriated. The defendant therefore urges that, inasmuch as these two basins are settling-tanks, it is freed from the charge of infringement. It is obvious that the patentee was referring to the reservoirs or settling-tanks which, in almost every pre-existing system for the purification of water which contained suspended impurities, had played an important part. The only known testimony in the Schwarz *927 walder Case in regard to the use of settling-tanks by the O. H. Jewell ■Company was that an hour elapsed in its plants at Columbia, S. C., and Chattanooga between the admission of the alum and the passage of the water to the filter-bed; that at Chattanooga the re-agent was fed into the pumps about half a mile from the filtering-bed, and that at Columbia a large subsidence tank is provided to receive the water before it enters the filters, and that settling-tanks were used at Louisville. The concluding sentences of the opinion were inserted ■out of caution, so as to show that these tanks, as thus stated and ■described, and with no more knowledge in regard to them than had been thus scantily given, were not to be included in the finding of infringement. The declaration was not that any basin which may be called a settling-tank could take the system with which it was connected outside the scope of the patent, and it is therefore necessary to look at the real function of these basins, and ascertain what they are in fact. If they had been designed to assist materially in the subsidence of suspended impurities, they would probably have been constructed so as to allow more time for the attainment of that result. The whirling of 3,600,000 gallons of water per day through small tanks in 13 minutes would seem to be inefficient for sedimentation to a material degree, but the examination of the tanks themselves by Prof. Main and Mr. Kendrick on October 28,1896, which was made with great precision, and with the attendance of the defendant’s selected experts, leaves no doubt that on . that day no material deposit of sediment could -be found, and that, so far as those in immediate charge of the tanks were concerned, an accumulation of sediment was neither anticipated, nor was habitually removed. On December 7, 1896, three scientists visited the defendant’s plant, at its request, and each found sediment in the tanks, but their general statements on the subject give inadequate data of how much they found. If they had been able to make such computations as to present the amount in figures, rati.er than by the use of words of general import, their examination would have furnished an exactness of information which is now lacking. Our conclusion is that sedimentation is not effected or promoted by these two basins in any material degree. They are “settling-tanks” or reservoirs in name only. Manifestly, a more important difference, in the minds of the three experts, between the filtrating system of the defendant and the patented method consisted in the fact that the coagulating action of the aluminum sulphate was begun shortly after its admission to the w'ater, and was completed in the basins by the time the water was about to enter the filter. It is said that it is desirable that this reaction should take place before the water reaches the filter-bed, otherwise the water is likely to remain turbid after it passes the filter. It cannot be of practical importance that the coagulating action should take place a few moments only before the entrance of the water into the bed, but the additional point is made that such a process of formation differs from that of the patent, which demands that the salts, or their equivalent, should be introduced into the water coincidently wnth its entrance into the filter-bed, and that the sticky hydrate should be formed within the bed. The claim of the patent *928 said that the method consisted “in introducing into the water, simultaneously with its passage to or into the filter, a substance which will, sufficiently coagulate or separate the impurities to facilitate their arrest and removal by the filter-bed.” It is true that in the specification the water pipe and the pipe containing the coagulating agent met near the filter-bed, and that the contents of the two pipes passed into the filter together, but the novelty of the process did not consist in the formation of the hydrate at or after the exact instant of time when the solution enters the filter-bed, and accordingly the court of appeals, in defining the patented method, said that the coagulant was to be “applied to or mixed with the water to be filtered substantially at its introduction into the filtering apparatus, and while it is flowing continuously to the filter-bed. By this method the coagulants perform their principal work within the filter-bed,” and settling-tanks are dispensed with. To urge that the defendant does not infringe because it mingles the inflowing current of water and the solution of alum while the water is flowing continuously to the filter-bed, but a few minutes before it reaches it, savors of technicality. The defendant has adopted the Hyatt "method of clarifying water from suspended impurities by an uninterrupted process of filtration, which is accomplished by introducing into the water while it is continuously flowing to the filter-bed a sufficient quantity of a coagulant.
It is next said that new issues have been presented in the defendant’s affidavits and in patents not in the Schwarzwalder record, which affect the validity and scope of the patent. „ The patent of most apparent importance which is referred to was issued by the TJni+ed States to Franz Pichler and Karl Sedlack—-No. 278,178, dated May 22, 1883—for an apparatus for purifying and softening water. It was evidently particularly designed for the softening of water, and consists of an inlet pipe, preferably of two branches, one for the influx of water, the other for the re-agent. The fluid then flows into a series of purifying chambers and of -sediment chambers, the latter being of larger cross section than the other chambers, so that the movement of the liquid shall be considerably slower and the deposit of the impurities shall be secured before the water finally reaches the filter. The specification presents the deposit of sediment in the sediment chambers of gradually increasing capacity as the chief feature of the invention, and the entire description contained in the paper patent shows that the alleged invention has no patentable relation to Hyatt’s process. Affidavits were also presented in regard to the use of settling basins between the noint where the water receives the re-agent and the filter-bed, which were used in two sugar refineries in New Orleans before the date of the Hyatt invention. The Planters’ Refinery plant is described with the greater particularity. The water went into a settling tub, where it received its reagent. It then passed through 3 other settling tubs, and thence to 10 filters, each 3 feet in diameter and 25 feet high. The dimensions of the tubs are not given. The plant delivered about 100,-000 gallons per day. If the drawing which the affiant annexed to his affidavit shows the size of the tubs as compared with that of the filters, the settling-tanks had a value for sedimentation, and were *929 in fact used for that purpose. Certainly they were far more important than the basins of the defendant. Inasmuch as the main inquiry before the circuit court was whether the defendant’s tanks are settling tanks in name only, the fact that other people had used tanks of a size and character which made them efficient throws but little light upon the issues involved in the present appeal.
The affidavits of three gentlemen that the beneficial character of salts of iron as a re-agent was suggested by one or more of them to Mr. Hyatt during his experiments in Hew Orleans prior to his application for a patent are inconsequential.
Three instances of the construction of filters of the Hyatt type, in a more or less perfect form, prior to the date of his invention, are next stated in affidavits. These instances are by Raynor, in Hew York, in 1878; by Peterson, in St. Louis, in 1882; and the alleged manufacture and use by B. T. Loomis, in Baltimore, in December, 1882. It must be recollected that the Schwarzwalder Case was contested with earnestness, and at great expense. The pre-existing patents were, produced in abundance, and an earnest effort was made to show the history of the art of filtration in all the forms in which it had been practiced. After the decision of the court of appeals, a motion for a preliminary injunction was brought, in accordance with the declared wishes of the defendant. Under such circumstances, where a new defense is interposed, the evidence to support it must be so cogent and persuasive as to impress the court with the conviction that, if it had been presented and cpnsidered in the former case, it would probably have availed to a contrary conclusion. Electric Manuf’g Co. v. Edison Electric Light Co., 10 C. C. A. 106, 61 Fed. 884; Bresnahan v. Tripp Giant Leveller Co., 19 C. C. A. 237, 72 Fed. 921. The account of the Raynor and the Peterson anticipations in 1878 and in 1882, in view of all the presumptions in the case, makes no impression upon the mind. The Loomis Case is stated with more detail. He was a manufacturer of filters in Baltimore, and in 1879 or 1880 made an experiment for the purification of foul water flowing from a factory and dye works in Wilmington, which was abandoned because the filters became clogged with the impurities in the waste water. In December, 1882, Mr. Loomis says that he applied his alum-feeding device to a filter in his shop, and successfully used it, in connection with the filter, for several months. He subsequently attached his feeding device to some of the filters, which were delivered in response to orders for filters from purchasers outside of Baltimore; but their names or residences, or the dates of the sales, or what the purchasers actually did with the alum-feeding devices, are not stated. Whether they were sold before or after the date of the Hyatt invention is not known. Hone were ever sold in Baltimore, which was his principal market. His prior use was, therefore, the use in his own shop, and whether this was experimental, for purposes of an advertisement, which was never responded to by his customers in Baltimore, can only be ascertained by investigation. As Mr. Loomis presents his case in his affidavit, this defense is not cogent or persuasive enough to impress us with the conviction that it would have availed in the Schwarzwalder Case.
*930 It is believed that after an exhaustive litigation upon a patent which is of known importance, and has been widely advertised, and after its careful re-examination and a favorable adjudication upon its validity by the appellate court, this class of paper affidavits in regard to priority by individuals ought not to be permitted to delay the owner of the patent from receiving the advantages which accrue from his successful struggle with infringers.
The next point is that the defendant is a public servant, is engaged in supplying the city of Magara with pure water, and therefore ought not to be enjoined. The defendant was eager that a bill for an injunction should be promptly brought, and stated its desire that the suit should be accompanied by a motion for a preliminary injunction, so that a speedy decision could be had. Under these circumstances, its point that the order for an injunction is inequitable is deprived of force.
The order for an injunction pendente lite is affirmed, with costs.